1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF OREGON

9

10  KEENAN KAHL,                        )
                                        )
11          Plaintiff,                  )   Case No. CV 08-739-HU
                                        )
12      v.                              )
                                        )   OPINION AND
13  FREIGHTLINER, LLC, DAIMLER TRUCKS   )      ORDER
    NORTH AMERICA, LLC, FREIGHTLINER    )
14  OF PORTLAND, LLC and WESTERN STAR   )
    TRUCK PLANT PORTLAND, LLC,          )
15                                      )
                                        )
16          Defendants.                 )
    _____ )

17  Benjamin Rosenthal
    1023 S.W. Yamhill Street
18  Suite 200
    Portland Oregon 97205
19
    Mitchell J. Cogen
20  Jennifer Bouman-Steagall
    Bullard Smith Jernstedt Wilson
21  1000 S.W. Broadway, Suite 1900
    Portland, Oregon 97205
22       Attorneys for defendants

23

24  ///

25  ///

26  ///

27

28  OPINION AND ORDER Page 1

HUBEL, Magistrate Judge:

Plaintiff Keenan Kahl brings this action against his former employer, Freightliner LLC (nka Daimler Trucks North America LLC), and Freightliner of Portland, LLC (nka Western Star Truck Plant LLC)(collectively, Freightliner). Kahl asserts claims for violation of the federal Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.* and violation of the Oregon Family Leave Act (OFLA), Or. Rev. Stat. § 659A.150 *et seq.*, as well as a common law claim for wrongful discharge.

The complaint alleges that Freightliner unlawfully pressured Kahl to return to work after surgery, before he had fully recuperated; interfered with his ability to take time off for post-surgery physical therapy; informed him that he could return to work early while on post-surgery prescription medication; and terminated him on November 28, 2006, allegedly for working while on prescription medication.[1] Complaint ¶4. Freightliner moves for summary judgment in its favor on all claims.

## Factual Background

Kahl worked as an intern at Freightliner while an engineering student at Oregon State University; after graduation, in June 2000, Freightliner employed him first as an entry-level design engineer, then as an entry-level manufacturing engineer. Declaration of Nancy Sheleretis ¶ 3. On August 2, 2004, Kahl started as a production supervisor in the Final Chassis Department of the Portland truck

---

[1] Kahl has withdrawn his allegation that Freightliner interfered with his ability to take time off for post-surgical physical therapy.

OPINION AND ORDER Page 2

plant. Id. Kahl then moved to an open position in the Offline Department (Offline) and spent the majority of his time there on swing shift. Id. Trucks are routed from the assembly line to Offline for correction of errors before delivery to the customer. Declaration of Wayne LaRochelle ¶ 5. In September 2006, Offline commenced a graveyard shift. Offline was the only department in the plant running a graveyard shift at the time, and Kahl became a supervisor on that shift. Id. at ¶ 4. Offline is adjacent to the main production facility, but in a separate building. Id. at ¶ 5.

Freightliner's company policies are contained in a "Human Resources Manual" available to all employees on the company's website or from the Human Resources (HR) department. LaRochelle Declaration ¶ 6. Kahl has acknowledged that as a supervisor he was responsible for knowing and understanding these policies. Declaration of Mitchell Cogen Exhibit A (Kahl dep.) 152:6-23. Policies relating to medical leave, short term disability, and the drug and alcohol policy are also posted in numerous locations around the plant. LaRochelle Declaration ¶ 6.

Freightliner has a Drug and Alcohol Policy (the Policy), with which Kahl was familiar, Kahl dep. 152:24-153:3, and which applies to all employees at the Portland truck plant. LaRochelle Declaration ¶ 9. Among other things, the Policy prohibits being "under the influence of drugs or alcohol" on company premises or during working time. The phrase "under the influence" includes a positive drug or alcohol test; urinalysis levels for nine different categories of drugs are specified. Id. Reporting for duty or

working while under the influence of any drug or alcohol, whether or not legally intoxicated, is prohibited and "will be cause for suspension without pay or discharge." Id. Prescription drugs are not exempt from the Policy. Id. at ¶ 10. The Policy provides:

> Employees who are required to take prescription drugs which may influence performance must report such drug usage to management for determination of work capability. Failure to do so will be cause for disciplinary action, up to and including suspension without pay or discharge.

Id.

Although the Policy states that employees taking prescription drugs are required to report to management, at the Portland truck plant such reports were to be made to the Occupational Health Nurse who was on-site at the plant. During the time Kahl was employed, the Occupational Health Nurse at the plant was Rosemary Rasmussen, R.N. Declaration of Rosemary Rasmussen at ¶¶ 2, 6. Rasmussen states in her declaration that the obligation of employees to report prescription drug use to the nurse was "widely and consistently disseminated to all employees." Rasmussen Declaration ¶ 7. She personally created many posters that were put up around the plant, creating new ones on a "fairly regular basis so that employees would not overlook them." Id. at ¶ 7. See also Exhibits B and C (samples of posters). Rasmussen also reminded supervisors of this requirement on an ongoing basis by placing flyers in their mailboxes. Id. at ¶ 8. She states that she is "certain" that she did this during the time Kahl was a supervisor. Id.

Supervisors are required to tell the reporting rule to their subordinates. Sheleretis Declaration ¶ 4; LaRochelle Declaration ¶

OPINION AND ORDER Page 4

11; Declaration of Timothy Kelsey ¶ 7. The Policy was strictly enforced, and posters throughout the plant informed employees that they were required to report prescription drug use to the nurse. Declaration of Jeffrey Dawley ¶ 9, Declaration of Timothy Kelsey ¶ 7, Sheleretis Declaration ¶ 4.

Freightliner's exempt employees, such as Kahl, were eligible for short term disability benefits in the form of payroll continuation for up to 60 calendar days upon receiving personal medical leave. LaRochelle Declaration ¶ 7. Kahl was eligible for and received such benefits for his medical leave in 2006. Id. The short term disability policy requires that upon return from medical leave, employees must present a doctor's note indicating that they are released to return to work. LaRochelle dep. 41:8-17.

In June 2006, Kahl was a production supervisor in Offline on the swing shift. Kahl dep. 129:22-25; LaRochelle Declaration ¶ 8. On Thursday, June 22, Kahl and another supervisor went out in the evening and ingested numerous drugs, including cocaine, benzodiazepines, and marijuana. Kahl dep. 173:1-174:1; Cogen Declaration ¶ 8, Exhibit F (deposition Exhibit 11). Kahl stayed up all night and reported for work on the plant floor on the afternoon of June 23. Kahl dep. 170:9-13. The other supervisor obtained an excused absence from work.

Manager Rick Oliver saw Kahl at about 6:00 p.m., and observed that Kahl seemed to be having difficulty staying awake. Oliver Declaration ¶ 5. About an hour later, Oliver saw Kahl again and recognized that he was impaired; he sent Kahl to his office. Kahl

OPINION AND ORDER Page 5

was slurring his words and could not sit still. Id. at ¶ 6. Kahl was sent home and told to report for a urinalysis. Id. at ¶ 6.

On June 26, 2006, Kahl reported for a urinalysis, where he told Karla Steffenson, the medical assistant working under Rasmussen, that he had prescriptions for Percocet (trade name for oxycodone, an opiate), Vicodin (trade name for hydrocodone, an opiate and acetaminophen),[2] and Xanax (a benzodiazepine). Kahl dep. 175:16-23. The urinalysis was positive for cocaine, benzodiazepines, and marijuana. Steffenson Declaration ¶ 5. Before that time, Kahl had not informed anyone in the nursing station that he was taking prescription medications. Id. at ¶ 6; Rasmussen Declaration at ¶ 11.

Reporting prescription drug use as a result of being called in for a random urinalysis does not satisfy the Policy notification requirement, because the intent of the Policy is determination of work capability and accident prevention. Steffenson Declaration ¶ 12. To determine work capability, the nursing staff determines the dosage, schedule, frequency, duration of anticipated use, and other factors or drugs that may interact with the reported prescription drug. This does not occur with an employee report during the urinalysis process, id., at least not for work that day. It is unclear whether this purpose is met by such a report for the future.

The same day as the urinalysis, Freightliner gave Kahl a referral to Freightliner's Employee Assistance Plan (EAP) and

_____

    [2] See footnotes 3 and 4 below.

OPINION AND ORDER Page 6

placed him on medical leave. LaRochelle Declaration ¶ 13. Kahl saw Stacy Young, LCSW, who referred Kahl to two other practitioners, a psychiatrist, Thomas Dotson, M.D., and a substance abuse treatment center, Northwest Chemical Dependency. Cogen Declaration ¶ 9, Exhibit G. Plaintiff remained on leave for a few weeks, receiving full pay under the Short Term Disability policy. LaRochelle Declaration ¶ 14.

On July 10, 2006, Kahl's gastroenterologist, Joseph Parent, M.D., noted that Kahl "wants meds which are habit-forming." Cogen Declaration Exhibit G 50:18-20. They were not prescribed.

On July 11, 2006, Kahl went to the nursing station for another urinalysis. Steffenson Declaration ¶ 7; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 12). Under the Policy guidelines, Kahl was required to test negative before returning to the workplace. LaRochelle Declaration ¶ 14. Kahl said he was taking Xanax and Seroquel. Steffenson Declaration ¶ 7; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 12). The initial test was positive for benzodiazepines, but a confirmation test from Legacy Metrolab, received July 14, 2006, indicated that the presence of the drugs was within acceptable limits. Steffenson Declaration ¶ 8; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 13).

On July 13, 2006, pursuant to Freightliner policy, Kahl entered into a standard Last Chance Agreement (LCA) that is required as a condition of reinstatement or continued employment following a positive drug screen at work. LaRochelle Declaration ¶ 15; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 15).

LaRochelle, Human Resources manager, reviewed the LCA with Kahl before Kahl signed it. LaRochelle Declaration ¶ 15; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 15). Under the terms of the LCA, Kahl agreed, in part:

* * *

2.    I understand that upon return to the workplace I must meet all established standards of conduct and job performance and that I will be subject to the company's disciplinary procedures for any failure to meet the standards.

3.    I understand that I may be subjected to a drug screen or alcohol test at any time that this letter agreement is in effect and failure to take the test or a positive result will be cause for discharge.

* * *

I understand and agree that my employment is contingent upon my meeting satisfactorily all of the above terms and failure to do so subjects me to immediate termination of employment with Freightliner LLC. These conditions are in addition to the Company's right to alter or end the employment relationship for reasons not contained herein.

LaRochelle Declaration ¶ 15; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 15).

Dr. Parent wrote that on July 25, 2006, Kahl asked repeatedly" for Oxycontin and Vicodin for elbow and knee pain, but Dr. Parent, noting that Kahl had "asked before," declined to give it. Cogen Declaration Exhibit G 55:22-25.

On July 11, July 17, and August 15, 2006, Kahl submitted to random urinalysis, as all employees on LCAs are required to do. Sheleretis Declaration ¶ 7. Kahl stated that he was not taking any prescription medications and tested negative or within acceptable limits for all screened substances. Steffenson Declaration ¶ 7; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 20).

OPINION AND ORDER Page 8

1    Kahl has testified that sometime in August 2006, he decided to
2    schedule knee surgery with Dr. O'Shea. Kahl dep. 237:4-14. Kahl
3    testified that when he discussed the surgery with Dr. O'Shea, Dr.
4    O'Shea told him he would be "bedridden for 10 days to two weeks,"
5    and "then from there, minimal walking, crutches, no running around
6    for ... another extended period," then slow jogging for three to
7    four months-in total, a "six month healing process." Id. at 237:15-
8    25. Kahl testified that he knew how long he would be off work
9    before asking Dr. O'Shea, because he had had the same surgery on
10   the other knee. Id. at 238:2-11. Kahl testified that he understood
11   that he would be off work for "three weeks, a month." Id. at 12-15.

12   On September 27, 2006, Kahl gave the nursing station a note
13   from his physician, John O'Shea M.D., stating that Kahl was
14   scheduled for right knee surgery on October 13, 2006. Rasmussen
15   Declaration ¶ 9; Cogen Declaration ¶ 8, Exhibit F (deposition
16   exhibit 21). Kahl asserts that between September 27, 2006 and
17   October 13, 2006, no one at Freightliner informed Kahl of his right
18   to take medical leave under OFLA or FMLA and no one gave him any
19   written information about his rights and obligations under those
20   statutes. Kahl Declaration ¶ 2. He did not know of the right to
21   take intermittent leave. Id. He was not told that he needed a
22   Certification of Health Care Provider, Fitness for Duty
23   Certificate, or a release to return to work. Id.

24   Rasmussen was the person responsible for processing all
25   medical documents relating to leave, and she has acknowledged that
26   the failure to provide Kahl with FMLA rights and obligations
27
28   OPINION AND ORDER Page 9

1  documents was due to an error on her part. Rasmussen dep. 38:23-
2  39:9; 51:4-20. Neither Rasmussen nor Freightliner identifies the
3  forms Rasmussen would have given Kahl had she not made this error.
4  Likewise, the record does not show whether Kahl had all the
5  information that would have been provided on the documents
6  Rasmussen "should have" provided despite her mistake. In any event,
7  Freightliner gave Kahl medical leave for the surgery. Declaration
8  of Geoff Jansen ¶ 5.

9       On the morning of the surgery, October 13, 2006, Kahl sent
10  LaRochelle and other employees an e-mail stating that he would be
11  "out effective this morning for a week." Kahl dep. 240:22-241:2;
12  LaRochelle Declaration ¶ 16; Cogen Declaration ¶ 8, Exhibit F
13  (deposition exhibit 22).

14       On October 13, 2006, Dr. O'Shea prescribed Kahl 30 tablets of
15  oxycodone[3] (trade names Oxycontin and Percocet). Supplemental Cogen
16  Declaration, Exhibit E p. 3. On October 14, 2006, Dr. O'Shea gave
17  Kahl a prescription for another 40 tablets of oxycodone. Id. at p.
18  7. On October 16, Kahl saw Dr. O'Shea. Cogen Declaration ¶ 11,
19  Exhibit I, p. 1. Dr. O'Shea noted that Kahl was being noncompliant
20  with his postoperative instructions, not keeping his knee elevated
21  and bearing weight. Id. However, the wound appeared benign except
22  for some mild bruising, the knee was neurovascularly intact, with
23

---

24       [3] Oxycodone is the generic name for an opioid analgesic. The
25  trade names of drugs containing oxycodone include Oxycontin,
    Roxicodone (oxycodone hydrochloride), Percocet (oxycodone and
26  acetaminopehen), Percodan (oxycodone and acetaminophen), and
    Combunox (oxycodone and ibuprofen). See
27  http://ww.rxlist.com/oxycodone-drug.htm.

28  OPINION AND ORDER Page 10

full extension and approximately 100 degrees of bend, and stable. Id. Dr. O'Shea wrote that Kahl was "requesting another prescription for pain medications," but because he appeared "with a somewhat altered mental state and slurred speech," Dr. O'Shea did not give him one. Id.

On October 17, 2006, four days after surgery, Kahl told Dr. O'Shea's staff he was "mentally ready to return to work," and that he had "not taken any pain meds today and he has had full range of motion." Cogen Declaration ¶ 8, Exhibit F, p. 11 (deposition exhibit 24). The doctor's office recommended that Kahl stay out of work at least until his sutures were removed at his scheduled follow up visit on October 26. Id. Kahl told the office he preferred to have his sutures removed by Dr. O'Shea at an appointment on November 2. Id.

Kahl has testified that after October 17, 2006, "I went as hard as I could not to take pain meds. I just toughed it out." Kahl dep. 265:6-10. Kahl stated, "I remember not taking pain meds until the day I went back to work and I got hurt." Id. at 265:9-11.

On October 20, 2006, Kahl presented at the Providence Portland Medical Center with what appeared to be minor cellulitis in his knee. Rosenthal Declaration, ¶ 3, Exhibit B (deposition exhibit 28). Kahl stated that he was currently on Xanax and oxycodone; the admitting physician, Todd Buerk, M.D., gave him another prescription for both. Id. However, Kahl testified that he "stopped taking the pain medication and the anxiety medication fairly quickly. ... I toughed it out as much as I could until I went back

OPINION AND ORDER Page 11

to work." Kahl dep. 273:13-24. Kahl testified that he stopped taking Vicodin "a week or so" after the surgery. Id. at 274:1-4.

On October 23, 2006, Kahl asked Dr. Parent, for oxycodone or Xanax; when Dr. Parent declined, Kahl said he could "get it another way." Cogen Declaration, Exhibit G 48:21-24.

Kahl and Jansen spoke regularly on the telephone while Kahl was on leave. Jansen Declaration ¶ 6. According to Kahl, his prognosis after surgery was bed rest for 10 days to two weeks and then minimal walking with recovery after three to four months. Kahl dep. 237:15-25; 238:12-15. Also according to Kahl, Dr. O'Shea told him he would be off work for a month to six weeks, after which he would be restricted to limited duties. Id. at 259:18-260:1; 262:25-263:6. Kahl testified that Jansen wanted him to return sooner, and asked Kahl "what was the minimal amount of time" he needed off, that he was needed, and "what it was going to take to come back." Id. at 260:3-11; 279:2-280:1. Kahl has testified that during his first week after surgery, Freightliner employees called him for direction. Kahl dep. 258:9-17. Kahl felt pressured to return to work. Id. at 284:3-9.

According to Kahl's testimony, during his medical leave between October 13 and October 29, 2006, Kahl advised Jansen "of the prescriptions that I may need to take in the event I do have some problems," and that "I may have to take Vicodin or an anti-inflammatory." Kahl dep. 281:14-25. However, Kahl also testified, "I didn't tell them I *was* taking it." Id. at 281:23-25. (Emphasis added).

OPINION AND ORDER Page 12

1    Kahl told Jansen that in order to return to work he needed to
2    stay off his feet as much as possible and ice his knee when
3    necessary. Jansen Declaration  ¶ 7. Kahl requested a cart and
4    access to ice. Id. Jansen agreed, id., and Kahl agreed to return to
5    work for the graveyard shift on Sunday, October 29, 2006.  Kahl
6    dep. 280:14-281:8. This was 17 days after his surgery, and he had
7    not yet been released by Dr. O'Shea. Id. at 288:17-20. When Kahl
8    went to work that Sunday night, the entire plant was shut down
9    except for the Offline department and Kahl was the only management
10   person in the plant. Jansen Declaration ¶ 8.

11       According to Jansen, a cart was brought to the Offline area
12   and left outside the door. Jansen Declaration ¶ 9. An ice machine
13   and gel cold packs were located in the nursing station, which is
14   kept unlocked. Id. at ¶ 10. However, Kahl asserts that no cart was
15   available to him and that the nursing station was locked, so that
16   he could not get to the ice. Kahl dep. 284:13-16; 286:1-6. Kahl
17   left work early. Id. at 286:16-17.

18       On Monday morning, October 30, 2006, Kahl complained to Jansen
19   about the absence of a cart and ice. Jansen Declaration ¶ 11. As
20   Kahl has acknowledged, a cart and ice were available from then on.
21   Kahl dep. 287:8-23. According to employee Jeffrey Dawley, during
22   the first few days after Kahl returned to work, he was always
23   driving a cart when he was on the shop floor. Dawley Declaration ¶
24   4.

25       On two occasions that Monday morning, Jansen told Kahl to
26   inform the nurse about any prescription painkillers that he might
27

28   OPINION AND ORDER Page 13

be taking. Jansen Declaration ¶ 13. According to Rasmussen and Steffenson, he did not do so. According to Rasmussen and Steffenson, Kahl did not mention any prescription medications to Steffenson or Rasmussen before November 21, 2006. Rasmussen Declaration ¶¶ 10, 11; Steffenson Declaration ¶¶ 10, 11. Kahl has testified that Steffenson "knew I possibly could be on Vicodin[4] when I came in after my surgery and told her" "that I may be on it," and that "I have a prescription and I may need to take it as needed." Cogen Reply Declaration Exhibit B, Kahl dep. 303:17-304:18. Kahl acknowledges that he started taking Vicodin for pain relief after returning to work. Kahl dep. 265:6-15; 274:1-15; 275:7-18; 276:14-277:4.

On November 2, 2006, Kahl returned to Dr. O'Shea for his scheduled follow-up. Chart notes for that day indicate that Kahl was "doing well," with "wounds healed" and that Kahl had been given a copy of his "OP Report." Cogen declaration ¶ 11, Exh. I, p. 3. That day Kahl gave LaRochelle and Steffenson 1) a return to work slip from Dr. O'Shea with the limitation of "minimal walking," and a follow-up date of December 14, 2006; and 2) a one-page "operations/procedure report" from Providence Portland Medical Center about Kahl's surgery. Steffenson Declaration ¶ 10; Cogen Declaration Exhibit I, p. 4, 5. No mention of prescription

---

[4] Vicodin is a trade name for a combination of the generic drugs hydrocodone bitrartrate and acetaminophen. See http://www.rxlist.com/vicodin-drug.htm. Hydrocodone is an opioid analgesic. Brand name drugs containing hydrocodone include Lortab, Norco, Vicoprofen, and Zydone. Id. Hydrocodone is a Schedule II controlled opioid agonist. Id.

OPINION AND ORDER Page 14

medications appears on either page.[5]

On November 21, 2006, in accordance with company policy, Sheleretis sent a list to the nursing station of all employees then on LCAs with instructions to perform random urinalysis tests on them. Sheleretis Declaration ¶ 7; Steffenson Declaration ¶¶ 4, 11. LaRochelle told Oliver to bring Kahl to the nursing station for a random urinalysis when he came in. Oliver Declaration ¶ 8; La Rochelle Declaration ¶ 19. At about 10:30 or 11:00 p.m., Oliver located Kahl on the shop floor and escorted him to the nursing station. Oliver Declaration ¶ 8. As she filled out the standard chain of custody form, Steffenson asked Kahl whether he was taking any prescription or over the counter medications. Steffenson Declaration ¶ 11; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 31). Kahl said he was taking ibuprofen and Vicodin. Steffenson asked about Kahl's use of Vicodin, and Kahl said he last took some that day at about 9:00 a.m. Steffenson noted this on top of the chain of custody form. Steffenson Declaration ¶ 11; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 31). According to Steffenson, Kahl had not previously informed her that he was taking

---

[5] Kahl testified at his deposition that he believed he gave Freightliner "Exhibit 28," which is the emergency room report from Dr. Buerk dated October 26, 2006. Kahl characterized this document as "my postop report," and stated that it listed all his medications. Cogen Declaration Exhibit B, Kahl dep. 296:2-7. Exhibit 28 is not a "postop" report. The "OP Report" provided by Dr. O'Shea is Cogen Exhibit I, p. 5. It does not mention medications. Moreover, this exhibit does not indicate that Kahl was taking Vicodin (hydrocodone); it states only that Kahl is currently taking oxycodone and Dr. Buerk gave Kahl another prescription for oxycodone.

OPINION AND ORDER Page 15

Vicodin, or any other prescription medication. Steffenson checked to see whether Kahl had informed Rasmussen about his use of prescription drugs, but the "Current Medications" portion of the OHM[6] was blank, which indicated that he had not. Steffenson Declaration ¶ 6; Rasmussen Declaration ¶ 11, Exhibit F.

Initial screening of Kahl's November 21, 2006 urinalysis indicated the presence of morphine and benzodiazepines. Steffenson Declaration ¶ 12; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 31). Steffenson contacted Oliver and told him Kahl's urinalysis was initially positive, but that the sample needed to be sent to a laboratory for confirmation. Steffenson Declaration ¶ 13; Oliver Declaration ¶ 9. Oliver told Kahl to go home and await the results of the laboratory confirmation. Oliver Declaration ¶ 9.

On November 28, 2006, the laboratory confirmation indicated that Kahl tested positive for hydrocodone and hydromorphone, consistent with ingestion of Vicodin. Steffenson Declaration ¶ 14; Cogen Declaration ¶ 8, Exhibit F (deposition exhibit 31). According to the Declaration of C. Kirby Griffin, M.D., who reviewed the test results from Kahl's sample collected November 21, 2006, oxycodone and hydrocodone are distinguishable from one another in the testing, and Kahl's results showed that he had ingested hydrocodone, but not oxycodone. Griffin Declaration ¶¶ 2-7, Exhibit A. Kahl acknowledges that Dr. O'Shea prescribed oxycodone, not

---

[6] OHM was an occupational health software system accessible only to the nursing station. OHM contains a tab for "Current Medications," under which any information reported by employees about prescription drug usage was entered. Rasmussen Declaration ¶ 11. See also id. at Exhibit F (screen print from OHM for Kahl).

OPINION AND ORDER Page 16

1  hydrocodone, but asserts that on November 21, 2006, he had taken
2  Vicodin that was left over from earlier prescriptions given to him
3  on May 18, 2006, May 26, 2006, and July 30, 2006.[7]

4      LaRochelle and Paul Erdy, the plant manager, discussed the
5  results and decided to discharge Kahl for violation of the Policy
6  and of his LCA. LaRochelle Declaration ¶ 20; Erdy Declaration ¶ 6.
7  LaRochelle sent Kahl a termination letter that day. LaRochelle
8  Declaration ¶ 20; Cogen Declaration ¶ 8, Exhibit F (deposition
9  exhibit 34).

10                              **Standard**

11      A party is entitled to summary judgment if the "pleadings,
12  depositions, answers to interrogatories, and admissions on file,
13  together with affidavits, if any, show there is no genuine issue as
14  to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is
15  not proper if material factual issues exist for trial. Warren v.
16  City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). A genuine
17  dispute arises "if the evidence is such that a reasonable jury
18  could return a verdict for the nonmoving party." State of
19  California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003). Where
20  the record taken as a whole could not lead a rational trier of fact
21  to find for the non-moving party, there is no genuine issue for

22  _____

23      [7] The three prescriptions were obtained from three different
24  physicians: Karen O'Neill, M.D., an emergency room doctor at
     Legacy Mt. Hood Medical Center in Gresham; Janice Miller, M.D.,
25  an internist at Westside Internal Medicine on Barnes Road in
     Portland; and Timothy Zeigler, M.D., an emergency medicine doctor
26  at Legacy Good Samaritan in Portland. Each of the three
     prescriptions was filled at a different pharmacy. Supplemental
27  Cogen Declaration ¶¶ 3-4, Exhibits B, C.

28  OPINION AND ORDER Page 17

trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. <u>Clicks Billiards Inc. v. Sixshooters Inc.</u>, 251 F.3d 1252, 1257 (9th Cir. 2001). The court may not make credibility determinations or weigh the evidence. <u>Lytle v. Household Mfg., Inc.</u>, 494 U.S. 545, 554-55 (1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovich v. Ins. Co. of N. Am.</u>, 638 F.2d 136, 140 (9th Cir. 1981).

**Discussion**

1.   FMLA/OFLA claims

Kahl asserts that Freightliner interfered with his exercise of FMLA and OFLA rights by discouraging him from taking medical leave, and then improperly encouraging to return to work before he was medically able to do so; failing to provide him documentation related to his FMLA/OFLA rights, which would have resulted in Kahl's putting Freightliner on notice that he was taking prescription pain medication and precluded his termination; and misleading him into believing he could return to work while taking pain medication, then terminating him for taking that medication. Freightliner challenges these claims.

OPINION AND ORDER Page 18

FMLA prohibits interference with the exercise of the employee's right to take leave. 29 U.S.C. § 2615(a). "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [and subchapter]." 29 U.S.C. § 2615(a)(1). Under Department of Labor (DOL) implementing regulations for FMLA, any violation of FMLA itself or of the DOL regulations constitutes interference with an employee's rights under FMLA. 29 C.F.R. § 825.220(b). The DOL interprets "interference" to include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Id. The regulations specify one form of employer interference--i.e., "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

OFLA is "construed to the extent possible in a manner that is consistent with" FMLA. Or. Rev. Stat. § 659A.186(2). Neither party has directed the court to any differences, for purposes of this case, between the federal and state statutes, so a single analysis of both claims suffices.

Kahl contends that Jansen asked him to postpone the surgery because Offline was adding a third shift, and that Erdy asked him to postpone his surgery until March 2007.[8] Kahl asserts that during the time he was on leave, Jansen encouraged him to return to work as soon as possible, and told him he could return to work while

_____

[8] According to Kahl's evidence, the surgery was elective, to correct a problem he had had for several years. Rosenthal Declaration ¶ 2.

still taking prescription medication. See Complaint ¶ 4; Kahl dep. 230:13-232:4; 238:24-239:8, 259:18-260:3-11, 261:4-16, 279:2-280:1. Kahl testified that he felt pressured to return to work. Id. at 284:3-9. Freightliner contends that taking these allegations as true fails to establish that Freightliner interfered with Kahl's FMLA and OFLA rights.

Freightliner argues that Kahl was obligated under FMLA and OFLA to consult with Freightliner about the surgery, to make a reasonable effort to schedule his leave so as not to disrupt unduly Freighliner's operations, and to work out a schedule that suited the needs of Kahl and Freightliner, see 29 U.S.C. § 2612(e)(2), 29 C.F.R. § 825.302(e), OAR 839-009-0260(9). According to Freightliner, it follows that Freightliner was legally permitted to discuss with Kahl the anticipated length of his leave and its potential impact on Freightliner. Freightliner granted Kahl medical leave on the date requested. Kahl returned to work voluntarily upon conclusion of his leave, and received all other FMLA and OFLA related rights and benefits, including being immediately restored to his former position.

Freightliner asserts that Kahl's subjective feeling that he was "pressured" to return to work is not supported by any evidence that Kahl complained of such pressure, that he was medically unfit to return when he did, or that he returned to work unwillingly. In fact, Kahl himself testified that it was "important" to him to "try and get back to work as quick as possible." Kahl dep. 238:6-8. Freightliner has proffered the email in which Kahl stated his

OPINION AND ORDER Page 20

intention to be out a week for knee surgery, and the fact that Kahl did in fact agree to return to work approximately two weeks after his surgery. LaRochelle Declaration ¶ 16; Kelsey Declaration ¶ 4; Kahl dep. 280:22-281:8; 282:18-283:2. Freightliner has produced evidence from Kahl's friends at work that upon returning to Freightliner, Kahl told them he was ready to go back to work, and that he never complained about his knee or gave any indication that he didn't want to be there. Timothy Kelsey stated that Kahl seemed "very excited to be back," and Jeffrey Dawley testified that Kahl roughhoused with him at work shortly after his surgery. Declaration of Timothy Kelsey ¶¶ 3-6; Declaration of Jeffrey Dawley ¶¶ 5-8.

Freightliner also points to the evidence that Kahl saw his surgeon, Dr. O'Shea on November 2, 2006, three days after returning to Freightliner, and said nothing to indicate that he was returning to work reluctantly. Kahl testified that he told Dr. O'Shea, "Hey, I'm going back to work. Can I get a note?" Cogen Reply Declaration Exhibit B, Kahl dep. 289:15-18. Dr. O'Shea's chart notes do not suggest that either he or Kahl had any concerns about Kahl's returning to work, and Dr. O'Shea released him with only "minimal restrictions." Cogen Declaration Exhibit I.

I conclude that on this record, a reasonable juror could find that Kahl's supervisors initially discouraged him from taking medical leave, then took actions that made Kahl feel pressured to return to work early, with the misimpression that his supervisor had given him permission to return while taking prescription painkillers so long as he reported their use.

OPINION AND ORDER Page 21

Kahl asserts that Freightliner interfered with his FMLA/OFLA rights when Rasmussen and Steffenson failed to provide him with documentation informing him of his FMLA rights and obligations, specifically documentation advising Kahl of the need for a Certification of Health Care Provider, Fitness for Duty Certificate, or a return to work release.

With the choice of submitting any of these three forms, Kahl argues that if Freightliner had provided him a "Certification of Health Care Provider," which asks whether the employee is required to take prescription medication, see Rosenthal Declaration Exhibit F, p. 12, then Kahl would have had his doctor complete the form disclosing Kahl was on Vicodin, putting Freightliner on notice that Kahl was on prescription pain medication.[9]

Freightliner has acknowledged that it failed to provide Kahl with documentation informing him of his FMLA rights and obligations at the time he took leave. The evidence does not show what documents Freightliner would have given to Kahl absent Rasmussen's mistake. Kahl has submitted a packet of documents, including forms, which he asserts Freightliner should have provided, either pursuant to federal regulations or perhaps Freightliner policy, including a a Certification of Health Care Provider.

While a Certification of Health Care Provider is not among the documents that an employer is *required* to provide to an employee

---

[9] Dr. O'Shea would not have identified the pain killer as Vicodin (hydrocodone), as argued by Kahl, but as oxycodone, which Dr. O'Shea had prescribed. A jury may or may not forgive the confusion over which prescription pain medication Kahl argues Dr. O'Shea would have mentioned.

taking FMLA leave, see 29 C.F.R. § 825.300(c)(3)("The notice of rights and responsibilities *may* be accompanied by any required certification form.") an employer may request that a Certification of Health Care Provider be provided with respect to an employee's leave. See 29 C.F.R. § 825.305(a)(employer *may* require that an employer's request for leave be "supported by a certification issued by the health care provider of the employee.")(emphasis added).

Freightliner has proffered evidence that it did not require medical certification to support FMLA leave in all circumstances. Rasmussen Reply Declaration ¶ 3; Steffenson Reply Declaration ¶ 3. According to a human resources policy document that was given to Kahl, see Rosenthal Declaration ¶ 5, Exhibit D,

> [w]ritten verification may be required from the treating physician to substantiate leave taken under this policy. ... Where written verification by the treating physician will be required prior to commencement of the leave, an employee will be notified in writing by the company within three working days of the receipt of the request.

Human Resources Manual, Procedure Number 311. Since Rasmussen neither provided the FMLA forms to Kahl, nor identified which forms she would normally have provided, there is a genuine issue of material fact on whether the usual Freightliner forms would have caused Kahl to disclose he was taking prescription pain medication on the required form(s).

Kahl also points to Freightliner's failure to provide him with a Fitness for Duty certificate, asserting that when he returned to work on the night of October 29-30, 2006, Jansen knew Kahl did not have a written release from his doctor. Kahl dep. 288:17-20. Kahl

OPINION AND ORDER Page 23

argues that if Freightliner had obtained a Fitness for Duty certificate from Kahl before he returned to work, Freightliner would have been on notice that Kahl could not perform the essential elements of his position and therefore would not have allowed him to return to work.

The FMLA fitness for duty regulation, 29 C.F.R. § 825.313(d) provides:

> When requested by the employer pursuant to a uniformly applied policy for similarly-situated employees, the employee must provide medical certification, at the time the employee seeks reinstatement at the end of FMLA leave taken for the employee's serious health condition, that the employee is fit for duty and able to return to work (see § 825.312(a)) if the employer has provided the required notice (see § 825.300(e)); the employer may delay restoration until the certification is provided. Unless the employee provides either a fitness for duty certification or a new medical certification ... at the time FMLA leave is concluded, the employee may be terminated.

Freightliner did not receive a fitness for duty certification from Dr. O'Shea until November 2, 2006. Cogen Declaration Exhibit I. Dr. O'Shea states that Kahl can return to work as of November 2, 2006, with a restriction of "minimal walking." <u>Id.</u> The certification from Dr. O'Shea made no reference to Vicodin or other pain medication. The document does not explicitly state that Kahl is unable to perform the functions of his job, but a jury could reasonably conclude that the restriction to "minimal walking" might have suggested that Kahl was not able to perform the functions of his job.

Kahl also asserts that Freightliner is equitably estopped from terminating him for testing positive for Vicodin in violation of

OPINION AND ORDER Page 24

his LCA, because Kahl returned to work early in reliance upon Jansen's representation that he could return to work on prescription medication. Kahl argues that had he known he could not return to work while taking medication, he would not have done so.

Kahl has testified that Steffenson "knew I possibly could be on Vicodin when I came in after my surgery and told her" "that I may be on it," and that "I have a prescription and I may need to take it as needed." While Freightliner denies that Kahl reported to the nursing station that he was taking Vicodin, a juror could believe Kahl and find that his statement to Steffenson about possibly being on Vicodin should have triggered the same sort of inquiry by her that a more unequivocal report would have triggered. Given Freightliner's admission that Rasmussen and Steffenson failed to provide FMLA rights and responsibilities notice when Kahl went out on leave, a jury could conclude that Steffenson failed to note the information Kahl says he reported to her, or failed to make an appropriate inquiry in response to Kahl's equivocal alleged report to her of drug use.

Kahl has created a genuine issue of material fact on whether he was pressured to return to work before he was medically stationary, whether he informed Freightliner that he was taking Vicodin for post-surgical pain before he tested positive for it on November 2, 2006, and whether Freightliner would have required Kahl to submit a Certification of Health Care Provider before going on leave that would have informed Freightliner he would be on prescription pain medication. Certainly, the factfinder will be

OPINION AND ORDER Page 25

faced with the discrepancies regarding which drugs were prescribed when, by which doctors, and for what conditions, and the evidence of Kahl's drug seeking behavior. But a jury could reasonably conclude that Kahl might have been confused about whether he had been prescribed or was taking hydrocodone or oxycodone. While one might predict that the jury's credibility determination between Kahl, his supervisors, and Steffenson would be favorable to Freightliner, I cannot say that no reasonable juror could find in Kahl's favor. Now is not the time to weigh the evidence. Accordingly, Freightliner's motion for summary judgment on this claim is denied.

        2.    Wrongful discharge

    Kahl asserts that he was wrongfully discharged in retaliation for exercising his FMLA/OFLA rights. Kahl has the burden of showing a "causal connection" between the protected activity and his termination. Shockey v. City of Portland, 313 Or. 414, 422 (1992). In other words, he must produce evidence that his protected activity in taking leave was a "substantial factor" in Freightliner's decision to discharge him. Estes v. Lewis and Clark College, 152 Or. App. 372, 381 (1998). A "substantial factor" is one which makes a difference in the discharge decision. Id.

    Because Kahl has survived summary judgment on his FMLA/OFLA claims, Freightliner is not entitled to summary judgment on the wrongful discharge claim.

                        **Conclusion**

    Freightliner's motion for summary judgment (doc. # 29) is

OPINION AND ORDER Page 26

DENIED.

     IT IS SO ORDERED.

     Dated this 5th  day of  April , 2010.


                        /s/ Dennis James Hubel

                          Dennis James Hubel
                 United States Magistrate Judge